Hear ye, hear ye, hear ye. The United States Court of Appeals for the 11th Circuit is now open according to law. God save the United States in this honorable court. Welcome to the oral argument of Kearse v. Secretary, FL Dept. of Corrections. We'll hear first from Mr. Khalil, attorney for the appellant. Thank you. May it please the court, this is Paul Khalil, assistant CCRC South, on behalf of Mr. Kearse, who's appealing the denial of federal habeas corpus relief. I'd like to concentrate on what is claimed to be of the initial brief regarding the ineffective assistance of counsel for failing to challenge the state's rebuttal mental health expert. As laid out in the brief, counsel was made aware that the state was going to be calling a rebuttal expert about 10 days before the penalty phase was to begin, and about three days before the penalty phase was to begin, he made a motion to continue because he said that he didn't know or had no idea what that expert was going to say. He said that he needed time to attend the evaluation of Mr. Kearse with the state expert. He needed time to depose the state expert and to learn what the expert was going to be saying. Of course, he did none of those things. He didn't attend the evaluation except to appear just for a few moments and object to the evaluation taking place. Well, counsel, he said he needed the extension in order to do that, did he not? Yes, and the court... But he didn't get the extension. So when you say, of course, he didn't do any of those things, it's not like he made a misrepresentation. If anything, that proves his representation was correct. Well, the thing is, Judge, the circuit court was explicit. It said that Mr. Udell had the weekend to attend the evaluation and to investigate and to do a deposition. And he ordered Mr. Udell to do the deposition. I think the language was, under the rule, they expect things to be done expeditiously. And this was a new rule that had just gone into effect in Florida that allowed the state to present a rebuttal witness in this way. But the fact remains, he asked for extra time. He said he needed the extra time. When the judge said, no, you've got three days. You're going to have to work on the weekend. He said, no, I'm not going to attend the evaluation. And then he didn't do the deposition. And then in post-conviction, he comes back and he rationalizes, I didn't do a deposition because I never do discovery because the state is going to learn something about my case. He gives a a frankly, a ridiculous post hoc rationalization for why he didn't do the deposition. He didn't say I didn't have time. He didn't say the judge didn't let me. He says, I never do depositions, which is, well, I'm looking, this is judge Wilson. I'm looking at pages 985 and 986 of the Florida Supreme Court's opinion. And the Florida Supreme Court says that Mr. Udell made a based on the fact that he knew what Dr. Martel's testimony would be regarding statutory mitigators. And he knew where his testimony would differ from the testimony of his own experts and that he correctly anticipated Martel's testimony. Isn't that a strategic decision that counsel is permitted to make in representation of his client? Not without preparation, Your Honor. Counsel can't just say, I'm not going to do these things and then come back and say, well, it was my strategy not to do them. With regard to the Florida Supreme Court's opinion, first of all, the Florida Supreme Court erroneously states that Martel had prepared a report and that Udell had provided the report to his experts. That's just but more importantly, trial counsel, he made absolutely no effort that we can glean from the record to learn anything about what Martel would say. And I think, and I would ask the court to go back. Well, that's not exactly correct. I mean, let's be fair. He spoke with people about what Martel was likely to say. Did not. I thought he did. Your Honor, he testified that he may have called the state attorney and asked the state attorney what Martel was going to testify to. There were no notes in his file regarding that. There was no evidence regarding that, that the state court credited his testimony. Well, I mean, you're stuck with those facts. Let me ask you another thing, which I think your brief misses entirely, unless I just didn't find it. And that is you use Dr. Dudley, Dr. Hyde, I believe, Dr. Crown as examples of the three experts that he could have obtained and to show the prejudice that he caused by not doing more to develop a case against Martel's position at all. You don't seriously maintain that he could have obtained those experts, got them familiar with the case, got them to evaluate the petition, got them to view the video of Martel's examination, and then consulted with him and got them ready and presented them at trial in Florida within the space of three or four days, do you? Well, your Honor, that's a good point. And I appreciate that. Well, how about a good answer? Yes or no? Well, no, I wouldn't expect him to be able to contact all three of those experts, as you stated. You couldn't expect him to get a single expert, contact them, find out if they were available, tell them about the case, send them the materials, get them to look it over, get them to evaluate the petition, get them to come down and watch the deposition or watch it up there wherever they are, and then get them prepared, questions and answers, interview them, and have them down to Florida to testify. I mean, come on. Your Honor, I'm sorry. Your Honor, the thing is he didn't need to get two or three experts. He only needed to get the one expert that Dr. Lippman told him about, which is Dr. Friedman. Dr. Lippman gave Mr. Udell plenty of notice that there were holes in the case. So Dr. Dudley, Dr. Hyde, and Dr. Crown, we can disregard them, right? No, absolutely not. I think that their information is important in post-conviction. However, we didn't get a COA on the issue of failing to present additional mitigation, and that's really not the case. And because it doesn't fit within the COAs we've got, we can disregard them, can't we? There's no way possible he could have presented any one of them in the time constraints that he has when he's getting ready for the sentencing trial anyway. Again, Your Honor, he could have presented Dr. Friedman. I know that. I'm asking you about those three witnesses whose opinions you present in some detail in your brief. And my question is, they really aren't relevant to our determination about his alleged failure to prepare for Martel's testimony and to refute it, the three whom he could not possibly have gotten to the sentencing trial. He asked for continuance. He was denied it. He couldn't, in the amount of time left, have gotten any of those three to testify, could he? I don't believe he could have gotten any of those three, no. Okay. Your argument, this is Judge Wilson, as I understand it, primarily is that Fidel, at the very least, a reasonably competent counsel would at the very least have taken Dr. Martel's deposition. Did he have time to do that? Your Honor, he should have had time to do that. Dr. Martel completed his evaluation on the Friday. The penalty phase didn't begin until the following Monday. And then, you know, there was time during the penalty phase itself where he could have conducted it, as the court, as the Florida Supreme Court said, on evenings or weekends. And again, the rule... Let me ask... Counsel, I'm sorry to keep interrupting, but this is an issue that I looked at pretty hard. The Florida Supreme Court at 986 of 969 Southern Second said, Karras has not demonstrated anything material that defense counsel did not anticipate or could have done differently had he deposed Dr. Martel. So, I mean, that is a finding, and it's a finding of no precious. Yes, Your Honor. I think that if you go back and you read the cross-examination of Dr. Martel, it's evident that Dr. Martel ran circles around Mr. Udell. Dr. Martel is a well-known expert. I'm certainly don't always agree with his opinions. To not prepare, to not know what this man is going to say when he gets on the stand results in what happened here, which is Udell was made a fool of in front of the jury. Counsel, this is Robert Luck. You've said a few times to not do anything, and it may be that counsel was deficient here. I know we have to talk about that, but I don't know if you can read the Florida Supreme Court's opinion and the facts that it found to be true. I think Judge Wilson referred to this earlier, and I know you contest the report, but at least the data was turned over to his existing experts, specifically Dr. Littman, and the Florida Supreme Court also found that he consulted with Dr. Littman in advance of the conversation, and that included Dr. Littman's consultation with Dr. Friedman, and he also spoke with the state attorney, again, according to the Florida Supreme Court, spoke to the state attorney about the substance of the testimony. Given that, we really can't say he did nothing to prepare, right? Your Honor, first of all, there's no indication, there's no evidence other than a very self-serving representation that he called the state attorney's office, and I'm sure if the state had evidence of that, it would have been produced. Self-serving representations all the time are found to be sufficient evidence. I mean, the very nature of testimony by one person on behalf of themselves is self-serving. I mean, that was credited by the state post-conviction court and found as a fact by the Florida Supreme Court that we need to take, as I understand it, and please forgive me if I'm wrong, we give that a presumption of correctness absent clear and convincing evidence to the contrary. What clear and convincing evidence is there that he did nothing? Your Honor, there's no evidence that did anything. I can't prove that he did nothing other than to say that there's no deposition, there's no report obtained, there are no notes in his files. The state doesn't have any evidence that I'm aware of that he conducted any sort of interrogatories or questions. But more importantly, going back to what you asked before about Dr. Lipman, yes, the Florida Supreme Court is advised of the problems with the opinion and whatnot. Please remember that Dr. Lipman is not a psychologist. And this was made evidently clear at the hearing or at the penalty phase where the judge actually threatened sanctions against Dr. Lipman for testifying outside of his expertise. Ultimately, though, Dr. Lipman's testimony, A, is used and credited by the sentencing court, as I understand it, to find, I think, 38 of the 40 mitigators related to this and, B, as I understand it, Dr. Lipman testified that because of his discomfort with certain areas that he actually consulted three separate experts, including the very expert that we're talking about, Dr. Friedman, and relayed that testimony as part of his own and that the court found that experts are entitled to rely on other experts and to use that hearsay and that expertise in formulating their own opinions. Is any of that wrong that I just laid out? It's, factually, it's correct, Your Honor. However, in the closing argument, the state made much of the fact that Dr. Lipman was testifying outside of his area of expertise, and it's very effective to the jury to say, well, this is all hearsay. Sure, it's admissible, but we're talking about a jury here, and we're not talking necessarily about the judge's findings. We're talking about the impression this would have had on the jury. If the jury sees a doctor outside of his expertise testifying to things that he discussed with another doctor of a different area of expertise, how are they supposed to give them any credibility? And then when the state gets up on closing... But, counsel, I'm confused about... So, we've already covered he did nothing. I mean, there's at least, as you've stated, you have no evidence to show that that's clear and convincingly wrong. And then, as Judge Wilson ably discussed, the claim really is the failure to depose. That's very separate and apart from did he consult with another expert as part of his cross-examination or get this person ready, prepared, flown down to Florida, have seen all the data within three or four days that he had to do so. I just fail to see the connection between the failure to depose with all this other stuff that was supposed to have done within a three- or four-day period. Well, again, Dr. Lippman... Excuse me. Dr. Lippman pointed out that Dr. Friedman was available, if I'm correct, long before the three-day period that you're discussing. But... It's not just the failing to depose. It's... Can I stop you and ask you about that? You're saying that Friedman was available long before the three-day period we're talking about. But I understood you... This is no kidding as a request for clarification. I understood you to say that the ineffectiveness, or at least one of them that you're stressing, was in Udell's failure to get Friedman briefed and ready and testifying in response to Martel. So the fact that Friedman was available before Udell found out anything about Martel doesn't advance the analysis, does it? And, Judge, I might have misspoken. Honestly, my recollection might be failing me here. But my understanding was that there was plenty correspondence between Dr. Lippman and Dr. Udell about Dr. Friedman. That's not what I'm talking about. Okay. When did Udell find out about Martel? Approximately 10 days before the penalty phase began. I think it was December... What is the four-day figure? What is the four days versus the 10 days? Well, the other figure that I had was the three days, which is the Thursday, Friday, excuse me, the Friday, Saturday, and Sunday before the penalty phase began on the Monday. What happened was Dr. Martel was to give his evaluation on the Friday. Does that answer your question? No. Okay. I don't understand why we're talking... Oh, so he knew Martel was coming seven days before Martel was to give his evaluation. Yes, that's correct. That's very helpful to me. And, Judge, forgive me if I'm off by a day or two, but he had plenty of notice is the point. They didn't drop Martel on the Thursday before the penalty phase. Martel was named the week prior. I appreciate it. There was more than a week. Okay. I did not get that from the briefs. That's helpful. Okay. I see that I'm pretty close to my rebuttal time. Well, I'd like to ask... Please. I'd like for you to address the Eighth Amendment claim. The state of Florida, in its brief, says that Atkins versus Virginia and Roper versus Simmons draw bright lines. It's not unconstitutional to execute an 18-year-old. And a finding of mental retardation is necessary to avoid execution under Atkins. Are you convinced that if you're convicted of murder and you're over 18, that's the end of the matter and the state court is not required to, thereafter, engage in a proportionality analysis? That's certainly not my position, no, Your Honor. My position, as we laid out, is that this isn't about a bright line. This isn't about Atkins, per se, or Roper, per se, for age. This is about the same reasons that we have Atkins and Roper apply to Mr. Pierce, because he's at the precipice of these two thresholds. So, you know, the death penalty has to meet... retribution, deterrence, none of those factors are met where you have an 18-year-old defendant plus 83 or 84 days, and you have a defendant whose IQ is arguably between 75 and 80. If we're going to just apply bright line rules like that, as the court, I think, noticed and there are going to be complaints about that, but we're not talking about an 18-year-old, well-functioning, well-developed individual here. We're talking about somebody who's barely 18 and, at the time of the crime, was said to have functioned at a sixth grade level. Counsel, let me ask you this. Roper said a line must be drawn, unquote, and that age of 18 is, we conclude, the age at which the lines of death eligibility ought to rest. And where would you draw the line now? Judge, I wouldn't draw an arbitrary line. I would say that if you are close to a child, and your behavioral development is that of a child, and you're within three months of being 18 years old, then what is the deterrence factor? What is the retribution? I thought that was your position, but then it seems to me that you're at war with the Supreme Court's holding in Roper that a line must be drawn. Well, what am I missing? Your Honor, this is not a straight-up Roper claim. This is a claim that says that it's unconstitutional because it doesn't serve any of the purposes outlined in Gregg for the death penalty to execute someone who, because of their age or infirmity, and infirmity, is not deterred, and it would be cruel and unusual. So it's not a straight-up, well, Roper should apply. It's a Roper in combination with... Counsel, this is Robert Lutz.  Contrary to or an unreasonable application of the holding of either Roper or Atkins? I believe that it is. I contend that the holding of Roper and Atkins is not limited to the mere bright-line rules, that the holding refers to the necessity that the death penalty, as it's imposed, when it's imposed, meets the requirements that it determines. Isn't that contrary to our discussion of what a holding is versus something other than a holding in a Supreme Court decision in the context of a DIPA? Yeah, I understand where the court's coming from. Well, I'm just asking the question. I'm not sure. I don't believe that it is, Your Honor. The reason I say that is because, you know, the whole... We're not talking about mere dicta here. We're talking about... Well, I agree with you. The quotes that you pull in your brief are not dicta from those opinions. But there's a difference between the reasoning you get to a holding versus a holding. You would agree with that? Yes, absolutely. And as I understand it, we've been very clear about the application of a holding versus anything else, whether that be reasoning dicta or anything else in an opinion, that a DIPA specifically requires that we only apply the holdings of Supreme Court opinions in judging those versus the application by a state Supreme Court. I agree that that's the case law from the 11th Circuit. Yes, sir. Okay. Thank you, Counsel. Counsel, your time has expired. Thank you. I would ask that you reverse and send back for habeas corpus release. Thank you, Mr. Pallel. You've got your full 10 minutes on reply, and we'll hear now from Campbell for the affiliates. Good afternoon, Your Honors. May I please the Court? This is Leslie Campbell with the Attorney General's Office on behalf of the state. Just to start where the Court has ended with the discussion of Atkins and Roper, there is no U.S. Supreme Court case that is applying a combination of a person who has recently turned 18 along with a person who is of more limited mental abilities to say that there is a per se bar to the application of the death penalty. That being said, the Florida Supreme Court's ruling that there is no combination of Atkins and Roper to bar the death penalty in this case is not a... Well, I don't leave the Florida Supreme Court opinion to say that. It's just a couple paragraphs in the opinion, and at the end of the opinion, and it says he's not mentally retarded and he's over the age of 18, and that's the end of the matter. Isn't the Court still required to conduct a proportionality analysis? The proportionality analysis was done in the direct appeal. It is not a federal requirement. Not based on an Eighth Amendment claim. What the Court was doing on direct appeal was opinion by the Florida Supreme Court on direct appeal. It doesn't say anything about the Eighth Amendment. That is correct, Your Honor. I'm just going on the proportionality analysis under Florida law, and then there is no proportionality... There's no proportionality analysis applying the Eighth Amendment, though, is there? The... Maybe I am not understanding your proportionality analysis. There's a proportionality analysis applying state law in the direct appeal. Yes, Your Honor. Balancing the aggravators against the mitigators, applying state law, but I do not see any mention of the Eighth Amendment. There's no determination by the Florida Supreme Court in the direct appeal that the sentence of death is not cruel and unusual. First of all... Is my understanding incorrect about that? Because the proportionality analysis under Florida law deals with the aggravators and the analysis that the trial court did. They did find that the aggravators well outweighed the mitigators, and therefore death was the appropriate sentence. The issue of whether there was an Eighth Amendment violation under Roper or Atkins was not an issue in the direct appeal. Those cases had yet to be decided. In post-conviction, when this was raised in the habeas, it was raised as a combination of Roper and Atkins. Finding that there was no violation of either Roper or Atkins, one because the defendant was over 18, which is a bright-line rule by the U.S. Supreme Court, and the defendant's find mental retardation. Therefore, there is no Eighth Amendment violation of either case, and there's no Eighth Amendment violation for application of the death penalty under these circumstances. I understand that, but I guess my concern is that isn't the court still required to conduct a proportionality analysis? No, Your Honor. It isn't? The court has looked at what the Florida Supreme Court looked at the applicable case law out of the U.S. Supreme Court and has found that there is no Eighth Amendment violation under either of those cases. There is no case out of the U.S. Supreme Court that requires that the Florida Supreme Court take into account the defendant's mental age or mental condition when assessing an Eighth Amendment challenge under Roper or Atkins. There's no combining of those factors. Let me pose a hypothetical to you. This is a hypothetical. This is not this case. Let's say the defendant did not set out to kill anyone. He ran a red light. He ran into an automobile. Someone was killed in the traffic accident. He's convicted for murder and sentenced to death. He's a few months past his 18th birthday, and he's almost mentally retarded, but he's not mentally retarded. Can he make a claim that the death sentence is cruel and unusual punishment under the Eighth Amendment? Would that be possible, you think? Counselor, the answer under Inman, of course it is. I mean, the Supreme Court said in Inman, if you sentence somebody to death who didn't have the intent to kill, it's disproportionate and violates the Eighth Amendment. Isn't that your answer? Yes, Your Honor. However, if there's been a finding that there was some sort of intent, then you're fighting Judge Wilson's hypothetical. He said, and there was no intent. Yes, the defendant is sentenced to death. He's convicted of first-degree murder, and he's sentenced to death. I think there would be a problem with the intent in that case, and then that probably would have been brought up on direct appeal. In a case like that would be required to conduct a proportionality analysis. Yes, it would have to be brought up under different circumstances, not under that he's mentally retarded, close to mental retardation. That was a part of my hypothetical. He's not mentally retarded. He's almost there, but he's not, and he's not a minor. He's just convicted of murder and sentenced to death. Shouldn't the court in a circumstance like that be required to conduct a proportionality analysis to determine whether or not a death sentence under those circumstances is cruel and unusual? Well, there is no case that combines those. If you're looking at Roper, it doesn't count. I don't understand why you're fighting the obvious. The Supreme Court in Inman, E-N-M-U-N-D versus the state of Florida, held that absent intent, the death penalty is disproportionate punishment. Period. Yes, that is correct, Your Honor. Okay, that's the end of the discussion. Mentally retarded or nearly mentally retarded, not, or age, whatever. Why can't you just concede that absent intent, it's automatically disproportionate because the Supreme Court said it was? Just like in Roper, they said one day short of 18 is disproportionate. Yes, Your Honor. Counsel, this is Robert Luck. Can I ask you, so I'm looking at the Supreme Court's opinion. This is at page 991 of the Supreme Court's opinion on the post-conviction case. The court describes the two arguments this way, or the argument this way. This is under the section called Constitutional Claims. First, he, being Mr. Kearse, argues that because of his age, low level of intellectual functioning, and mental and emotional impairment, he cannot be executed under Atkins, which prohibited execution of people with mental retardation. Then one page later, next, he, being Mr. Kearse, argues that because he was only 18 years and three months old at the time of the crime and had low level intellectual functioning and mental and emotional impairment, he cannot be executed under Roper. Were those his arguments? Yes, they were his arguments as well. That's not a discharacterization of his arguments, is it? I do not believe so. I believe it's a fair characterization of his arguments. And the Supreme Court addressed those head on, and I'm not discussing whether it's correct or not. We can talk about that in a second, but the Supreme Court addressed those head on, correct? Yes. And so, as I understand it, and please correct me if I'm wrong, our question under ADIPA is whether the application of that is contrary to or an unreasonable application of the Supreme Court's cases in Atkins and Roper, correct? That is correct, Your Honor. Was there any other proportionality-type argument made by Mr. Kearse at all in the post-conviction context? Not a proportionality under the Sixth Amendment. Right, he made other constitutional- Right. Right. There was the general, the defendant is of limited mental ability, and the defendant is just over the age of 18, who's chronological age. It was under both and more or less a- Counsel, so we may be misunderstanding each other, and I may be having the same problem that my colleagues are having. I read you exactly the Supreme Court's opinion, and I told you the page numbers that it's on. Was there a proportionality claim, an Eighth Amendment claim, different and apart from those that I read to you? No. Okay. Not under my reading of his argument, no. Okay. At any time during post-conviction proceedings, meaning the initial post-conviction, not successive petitions, in the initial post-conviction proceedings, was any Eighth Amendment proportionality argument made different than those that I just described to you by the Florida Supreme Court? No, it was raised in the state habeas petition, as the Florida Supreme Court's discussed it. Right. So, if the Florida Supreme Court addresses those, again, not discussing whether it's correct or not, our review under ADEPA is whether the Florida Supreme Court decision was contrary to or an unreasonable application of those two Florida Supreme Court opinions, correct? Yes, Your Honor. Okay. Now, is it or is it not contrary to or an unreasonable application of those two U.S. Supreme Court decisions? No, it is not contrary to or an unreasonable application. What would we do if we were to find that the Florida Supreme Court's decision is an unreasonable application of Supreme Court authority, other than Atkins v. Virginia and Roper v. Simmons? What would we do in a circumstance like that? Well, there is no, other than Edmund, who was just talking about the intent, there is no Supreme Court, U.S. Supreme Court decision addressing these factors. And therefore, the Florida Supreme Court's decision is not contrary or unreasonable to a holding of the U.S. Supreme Court. And therefore, habeas relief should be denied. So, we would have to ignore Supreme Court authority, which would hold that the state courts are required to conduct a proportionality analysis? The proportionality analysis is to look at Roper and Atkins under these factors. Therefore, when those cases are looked at and it's determined that the death sentence is not contrary to Roper or Atkins, that ends the inquiry. And there is no constitutional violation. That's the end of the matter. If you're over 18 and you're not mentally retarded, that's the end of the matter. As far as a bar to the death penalty, yes. Thank you. If there are no other questions, I'll turn back to the issue of ineffective assistive counsel for failure to depose Dr. Martel. The trial court in assessing Mr. Martel, excuse me, Mr. Udell's testimony at the evidentiary hearing credited that testimony that he either talked to the state attorney or he talked to Dr. Martel and he got the information as to what Dr. Martel was going to testify to. He also received the raw data from Dr. Martel and he gave that to his expert. He prepared his expert and in anticipation of Dr. Martel's testimony, he questioned the experts, especially about the MMPI, whether or not there was malingering, whether or not the defendant was confabulating, whether or not there was a conduct disorder. And it is clear from the record that he challenged Dr. Martel on all of the factors that the defendant is now claiming should have been challenged at trial. This is Judge Wilson again. Mr. Kearse is facing the death penalty and Martel is the state's only mental health expert. Seems like reasonably competent counsel would, as the district court in this case found, would have at the very least taken his deposition. Number one, that is not a necessary requirement, especially when you have the raw data and you have information as to what the expert would say. It is not unreasonable strategy not to try your case before the state attorney hears the case at the trial. So there is no U.S. Supreme Court case saying that it is a per se ineffective assistance matter to fail to dispose, to depose an expert. How do we, Wilson again, how do we factor in the fact that on his expense voucher he charged the government for an hour and a half for taking Martel's deposition? He made a mistake on his expense report. He, for whatever reason, he miscalculated. He misremembered whatever. The fact is the experts were sufficiently prepared. The experts countered Dr. Martel. Dr. Littman consulted. Counsel, this is Robert Luck. I want to ask you sort of a general point about what you discussed regarding depositions. Approximately how many states still allow for or authorize the capital punishment? About 20 to 25 or so? Or maybe a few more, your honor, yes. Okay. How many, do you know how many states allow for depositions, pre-trial depositions like Florida's procedure? I do not know, your honor. If I told you it was only two, Florida and I think one other state, maybe New Hampshire or a state out west are the only states that have this sort of deposition procedure. Would that be unreasonable or would that sound way off? No, I wouldn't counter your honor's investigation in that matter. All right. With regard to depositions, most death penalty states don't have a deposition procedure to depose witnesses prior to trial, right? Yes, your honor. How do they go about doing that? How do you go about, how does counsel go about preparing? If he has reports, if he has the raw data, his experts look at those things. So exactly like the counsel did it here, right? Yes, your honor. And the fact is Dr. Lippman did consult with Dr. Friedman and read from his report, gave that information to the jury. In the post-conviction, Dr. Friedman would not have changed any of his information that was in that report. And the same information would have come out then before the jury, whether it was Dr. Friedman in person or Dr. Friedman via the information Dr. Lippman relied upon. Bottom line is there was nothing in the evidentiary hearing that would have changed the information that was actually presented to the jury. That renders counsel's performance not deficient and certainly no prejudice. Any other questions on that issue, your honor?  No. Then I would rely on my brief and ask this court to affirm the denial of habeas relief. Thank you. Thank you. With regard to Dr. Lippman giving the information to the jury that Dr. Friedman would have given, the state's taking a different position today than they took at the trial where they told the jury, don't believe Dr. Lippman because he's talking about what some other doctor told him. Now the state seems to think that that's fine. That's not what they told the jury in this case. They went to extreme lengths in closing argument as well as in the examination of Dr. Lippman to discredit him on that basis. I think it's disingenuous to now say, well, no, that was fine to do. And I want to just go back briefly to the cross-examination of Dr. Martel. The state says, well, you don't have to pre-try your case in front of the state attorney. If you read that cross-examination, that to me, I'm not a trial lawyer, I will admit, but that to me reads like a deposition of the state's expert. He's conducting a deposition, a discovery deposition in front of the jury. It's clear. The first 10 pages is what about your opinion would have changed if you didn't have some information trying to cover for the information he didn't provide to his own expert. But then he goes into asking questions where it's clear he does not know the answers. Let me ask you this. Judge Larkin made a very good point, which I hadn't thought about. Only one other state allows pre-trial depositions in criminal cases, like Florida does. Are all those defense counsel who end up at a sentence hearing, can't depose the defense witnesses, ineffective as a result? Well, they have to operate under the laws and the rules that they operate under, Judge. In Florida, if you're given the opportunity to conduct discovery and you choose not to do it, that falls below an objective standard of reason. This had taken place and Mr. Udell and the petitioner and everybody had been in Alabama and he had done exactly the same thing, there would have been no fixed amendment violation, no ineffective assistance of counsel, even if he basically deposed the star witness for the state in front of the jury at the sentence hearing. Everything would have been constitutionally kosher, right? Judge, I'm not barred in Alabama. I'm not barred in any other state. I can say that I would assume that those states have some measure by which trial counsel in a death penalty case can conduct some form of discovery, either by obtaining a report, doing a deposition, perhaps moving to do a deposition and having that granted by the court, which Udell did in this case and the court ordered him to do it and he didn't do it. So I don't see that really as a bar to the argument. And again, in Florida, you have a right to do the deposition, the standard in the community in Florida. For determining what is reasonable attorney performance would be deposed the state's expert. At least obtain a written report. Don't go into trial with a state expert who's well-known and well-respected, although controversial, but respected in that he's very professional and he's very good in front of a jury. You don't just go in blindly and start discovery in front of the jury. Let me ask you this. The Florida Supreme Court held that Pierce has not demonstrated anything material that defense counsel did not anticipate or could have done differently had he deposed Dr. Martel. Is that actually wrong? Has defense counsel shown things that he could have done differently? The most important one would be he could have presented Dr. Friedman to rebut Martel's testimony rather than going about it the way he did, leaving Dr. Lippman not only incredible with regard to areas outside of his expertise, but discrediting his opinion altogether. Yeah, but I understand you don't take, and I won't qualify this, but you don't take exception to, as Judge Luck pointed out, that the Florida courts found, or I think it's a fair reading, that Lippman conveyed the substance of what Friedman would say or would have said or what Friedman believed. He conveyed that to the jury. Your response to that is, yeah, but the state told the jury not to believe it. We don't know whether the jury took the state's advice or not, but then the prejudice would be in the difference between what Lippman told the jury about Friedman's opinions and the amount, if any, by which the jury discounted those at the argument of the state because their hearsay, right? Their hearsay and their outside of Lippman's area of expertise, correct. Yeah, but Lippman, I didn't think, was presenting them as Lippman's views and opinions entirely, but also of what Friedman said. Am I wrong? Yes, that's correct. He was presenting them as what Friedman said. Okay. And just to be clear, yes, Dr. Lippman discussed this with Mr. Udell, but he also said to Mr. Udell, we need to have a psychologist testify as to specifically the MMPI results and why they show that he's a disturbed individual. Udell did nothing. He didn't even respond to the letter, and this was well before the penalty phase. By the way, I just wanted to mention for the court, I laid out the procedure for Martel doing his evaluation. Udell got notice on November 30th, 1996, that Martel had been named. And he, at that time, he was scheduled to examine Mr. Kearse a week later on December 6th. So he had at least a week's notice and 10 days, 13 days before the penalty phase actually began. Again, I would ask the court, please reread what I consider to be a discovery deposition conducted in front of the jury. I don't, again, I'm not a trial lawyer, but I just don't see how that is reasonable in any circumstances. Also to the extent that the Florida Supreme Court relied on Mr. Udell's testimony and his billing. For the state to say that he made a mistake on his billing, I think is inaccurate. Mr. Udell also billed four and a half hours for conducting an evaluation where he sat there for a few minutes and then got up and walked out. Now, that's not an error. And Mr. Udell- Is he still a member of the Florida Bar? No, sir. And that's what I was getting at. He was subsequently disbarred for filing false fee affidavits. And incidentally- Counsel, you have two minutes. Thank you. Incidentally, he was also found to be ineffective in several other cases, not only in California, but in Florida as well. And I believe that's all on the record as well. Do you think that's prior bad acts that we ought to consider? Well, he's not being accused of a crime. I know that. I'm using that terminology to focus on it. If he was ineffective in California, he's darn sure ineffective in Florida. I mean, what's your logic there? I do believe that it goes to his credibility that he was disbarred. Now, I'm not talking about disbarred. I thought you said he was held ineffective. Yes, I did. All right. So if he's held ineffective in another jurisdiction, that makes it more likely he was ineffective here? Judge, I would say yes. I will admit that that's not necessarily the case. So if we have an attorney who's been attacked as ineffective and upheld as effective six prior times, that makes it more likely and we ought to consider he was effective in his seventh case? I would say that if there's lots of, you know, if there's evidence that he was ineffective, it would be... No, no. Effective. I'm trying to test your position. Okay. If an attorney is challenged as ineffective six times in different jurisdictions, same jurisdiction, whatever, and all the times there's an adjudication, a judgment, a decision that's upheld that he was not ineffective, he was effective, should we consider that on his seventh capital case trial where he's challenged as ineffective? Should we consider he must be effective because he's been effective six times before? I understand your question now. No, not necessarily, Your Honor. It only works the other way. You don't have to say no. I'm sorry? This is Judge Wilson. You don't have to say no to that question. Well, the point I'm trying to make is that it's not determinative either way. My bigger point is that this is a man who said all sorts of things under oath that are just not true. Counsel, your time has expired. Okay, counsel. Thank you, Mr. Coyle. We appreciate that and thank you, Ms. Campbell, for the argument. We'll take case under submission. Thank you very much. Have a good day. Thank you, Your Honor.